May it please the court. My name is Eric Fromay and I'm here with my colleague John Carter of Gibson, Dun & Crutcher. We are a pro bono amicus council on behalf of Anna Sargsyan and Tadevos Karpecyan. I'd like to reserve a couple of minutes for rebuttal and I'll try to keep my time. All right. This case is about Anna and Tadevos who were victims of severe religious persecution in Armenia because of their Pentecostal faith. This occurred from 1995 until the present when they arrived here in the United States. The persecution was intensified because Tadevos is the son of a famous poet in Armenia. Viewed cumulatively, the record compels a finding of past persecution and we detail this throughout the record on page 14 of our brief, your honors. It began in 1995 where there was a brutal raid on a religious worship that both Anna and Tadevos were attending. Tadevos was severely beaten and Anna was... Who was severely beaten? Tadevos, the husband of the petitioner Anna Sargsyan. Doesn't she also testify that she was beaten? She doesn't... The record is not clear that she... At ER 91? I'm sorry, what was that? At ER 91, she says she was hit? I think she was hit at both the 1995... Well, she testified to that. So I would think that you would take care to describe her testimony accurately. I'm sorry, your honor. I didn't mean to misdescribe her testimony. She certainly was a victim in the 1995 incident and again in the 1999 incident where she was struck as well. In the 1995 incident, I did note that she said they were hitting the women, but there wasn't any specific testimony of injury to her. Was she injured or did she testify? Is there in the record something indicating that she was personally hit or hurt during the 1995 incident? I believe in the 1995 incident, and I want to be accurate about this, is that she was a victim. She was a witness of the beatings, and I believe she was struck at the 1995 incident as well. Well, on page ER 91, she says they were hitting him and they were hitting us. Does us include me and others? I mean, how do you... She says they were hitting us, the women. Again, your honors, I'm not, as I said, I'm not sure exactly as the record stated, but it was a private... Us has multiple interpretations, your honor. So are you arguing that your client wasn't hit? No, I'm not. I'm saying that the record is not clear, but it looks like she was certainly a victim of the assault. Whether she was specifically hit or not is not clear in the record. Why is it not clear when she says they were hitting us? I think, to be honest, your honor, that that testimony is subject to multiple interpretations. I think us is a reasonable interpretation. I'm sorry? What are the interpretations? Well, I think us is a reasonable interpretation that she was actually hit. I think us can be reasonably interpreted that, you know, women were hit and she may not have been hit. The IJA did not press that issue. I think that is a reasonable interpretation that she was a victim and she was struck, and she witnessed others severely beaten at the 1995 incident. Your honors, that brutal raid occurred in 1995, left Tadevos in... What was that? He left him to recover for several weeks, and he lost his memory for a much longer time. They went into four secret war... Excuse me. Do you want to find it? Hello? Hello? Hello, can we speak to Alana, please? Hello? I'm sorry, sir. You've called into a courtroom where there's an ongoing proceeding. Please hang up and figure out what number you really want. I'm trying to reach Alana Daraz. Okay, well, you will not reach her here, so please hang up. You got the wrong number. Thank you. Okay, we need to add some time on to your argument. I have two minutes. We'll add two minutes at the end. Thank you. That's generous, your honor. I think the record's clear that they were forced into secret worship in Armenia. They were subject to death threats, both Anna and Tadavos, and threats for their religious beliefs throughout their time since the 1995 raid. Could I ask you about the secret worship issue? I know that there was some discussion at their first meeting, I guess this was in 99, where the officers burst in and beat them, or I guess this was in 95. But then the record seemed to indicate that they met in other places, and there was no indication in the record that I saw that they were forced to worship in secret. So I was just wondering what specifically you were referring to. Well, I think the government's brief leads to some confusion when it says that they worshiped in public, and that's not an accurate reflection of the testimony witness highest. I don't have the exact citation of the record, but she testified that they worshipped sometimes outdoors, but they certainly weren't worshipping in public, and they worshipped in private homes. And that's the secret worship that they were subjected to, to stay out of the public eye. Okay. There was several mentions from the eyewitness about, we have gathering in an open place outdoors and outside a movie theater and outside outdoors in a couple of places. This was in Record 133 and 134. But otherwise they met in homes, and that's the evidence of the secret worship is that they were meeting in private homes? Sure, and the evidence in the citations of the record, again, is in page 14 of our brief, and in the transcript, pages 46 to 47, or the administrative record, pages 96 to 97, where they talk about their secret worship, Your Honor. There was also they were denied a certificate for marriage because of their religious belief in 1997, and then in 1999 we talked a little bit about the beating by, the beating of Tadavos where he was knocked unconscious, and Anna was also beaten and forced to, forced her face into the mud where they gave her a mock baptism. In the 1999 incident, she testifies that it had nothing to do with their being Pentecostal. Yeah, and she does testify to that, and that leads to some confusion because she does mention also in that testimony that they refer to her religious faith, and they say, now you'll be baptized. And Tadavos testified that he spoke at the event and did mention his faith and did mention the criticism of the Apostolic Church. So it's clear that they were, that the evidence is that they were persecuted for their religious beliefs, both Tadavos and Anna's testimony substantiate that. How do you explain that testimony where she does state it had nothing to do with their being Pentecostal? Is that? I think that's very confusing testimony in total, but it doesn't match with the rest of the testimony of both herself, her own testimony, the testimony of Tadavos, the testimony of Hiaston, and also doesn't match the independent items in the record which were submitted, the newspaper articles about, that identify Anna and Tadavos by name and criticize them for joining a cult, the archbishop's interview where, again, he says anybody not part of the Apostolic faith is a threat to security. And we have the same, interestingly, we have the same State Department report as the prior two cases. It doesn't mention Pentecostals specifically, mentions Jehovah's Witnesses, but I think it generally supports the fact that those who are not part of the Apostolic faith are persecuted in Armenia. I note that it's not in the record, but the 2006 report clearly does refer to Pentecostals and notes that the situation in Armenia has gotten worse. So was Tadavos' father part of the Armenian church? I'm just wondering that the fact that his son was speaking out against it would make it even a worse situation. When his father was being honored, I gather. Yes, the record's very clear that Anna was born in the Apostolic church. It's not as clear that Tadavos was born in the Apostolic church. He does mention that he converted, though. He does mention that he has left the church of his father, and he's the prodigal son that has left the faith of his father and left the Armenian church. So, yes, there's substantial evidence in the record that Tadavos was born in the Apostolic church and converted to the Pentecostal faith. So why was his father being persecuted? His father was a famous ponent in Armenia and went under the Soviet occupation of Armenia. And he often spoke out about the freedom for the Armenian people from the Soviet oppression. And at that 1999 speech where Tadavos spoke about his father, Tadavos also mentioned that his father believed in the freedom internally for Armenia and referred to the Pentecostal faith. All right, so you wanted two minutes for rebuttal. Yes, and I think that would leave me about three minutes here, and I'll save that for rebuttal. All right. Thank you. Good morning, Your Honors. May it please the Court. Martin Estrada, representing the government. Your Honors, there are two primary issues here that were briefed by the parties. Those are the credibility issue and also the merits of the appeal. Because the merits of the appeal appears to be the central issue before the Court, I'd like to address that first. The question before the Court is whether the evidence in the record would compel any reasonable fact finder to conclude that Sargsyan was persecuted and has a valid asylum claim. And we simply don't have that sort of compelling evidence here. Now, the most serious incident appears to be the 1995 incident where Sargsyan's Pentecostal group was intruded upon by military men. Her fiancée at the time was beaten at that time. Other men were beaten and went to the hospital. The women appeared to have been hit as well. But what's significant about this is that it doesn't appear that Sargsyan herself suffered any sort of severe physical harm. Is that a requirement? It is not a requirement, but case law of the circuit finding that physical harm established with persecution has found that severe sorts of physical beatings are the sorts of things that give rise to compelling finding of persecution. Secondly, and most importantly, is the fact that after this incident, the group was able to relocate to another location about 15 minutes away by foot and continue engaging in their own activities. And the record indicates that Sargsyan was able to continue practicing her religion in Armenia until she left Armenia. In secret, in homes? Well, on the secret point, it does say that it was in homes. There's nothing in the record specifically saying that Sargsyan had to practice in secret. And, in fact, the marriage incident, which I'd like to talk about, the fact that she was denied a certificate for being Pentecostal and then went to the police to complain about that would suggest that she wasn't trying to keep it completely secret, the fact that she was Pentecostal. And with regard to that 1997 incident, we have Sargsyan and her husband, now husband, being denied a marriage certificate because of the fact that her husband had converted from the Apostolic Church. While this incident may be a reproachful one, it doesn't arise as sort of extreme circumstances that this court has found constitutes persecution. It could be described as perhaps discrimination, but this court has been very clear that discrimination alone does not constitute persecution. What about the death threats? Which death threats? That Tavedos testified to, I guess Anna testified that she was publicly ridiculed and Tavedos testified that he received death threats as a result of his having converted into the Pentecostal religion. Well, we don't hear about the death threats in Sargsyan's testimony. I'm a little unclear as to where the death threats are. There's some... It's all part of the same hearing. It's all part of the same evidence that the IJ has to consider. Correct, Your Honor. But what we have most significant is the 1999 incident, which the court may be referring to, where, in fact, Sargsyan's husband was beaten up and certainly threatened at that point. What's significant about that incident is that, first, there's no evidence in the record that this was perpetrated by a group that the government was unable or unwilling to control or perpetrated by police officers or military. Could I just go back to the death threats? If you look at ER 122, and we're talking about Tavedos' testimony, I guess it starts 121. I have one question. Anything happen to you between 1995 and 1999 that relates to your asylum claim and your wife's asylum claim? I've been warned several times I should resign from the faith I've embraced. They wanted me to go take the path of my father. Did they do anything else? They were scaring me. They said, we'll beat you up. We'll kill you. Who are these people? Military personnel. That's not death threats? Now, it appears to be death threats, but this raises another issue here. One of the problems with finding compelling evidence of persecution here is that we have the fact that a petitioner is Pentecostal. Her husband is Pentecostal. But this is intertwined with the fact that her husband was the son of a very famous and controversial poet in Armenia. And if you look at all the incidents, the 1995 incident, the 1999 incident, the 1997 incident, they're all where Sargsyan is with her husband. And it's hard to disentangle the fact that he's the son of a famous poet and the fact that individuals seem to dislike the fact that he's converted and speaks out as a son of a famous poet. I'm not following that argument. So you're saying it's hard to disentangle whether it's political persecution or religious persecution? Well, we don't know if it's political. All we know is that he was a controversial figure. Okay, then let's assume it's not political. Let's assume it's partly religious and partly not one of the enumerated. Okay, then let's assume it's not political and partly not one of the enumerated grounds. Doesn't that fall under the mixed motive cases? Well, it depends on if it's a protected ground. My understanding is that... Religion is a protected ground. Religion is a protected ground. And what's our case law on when there's persecution on the basis of a protected ground and an unprotected ground? Protected ground and unprotected ground. I'm not familiar with that. I didn't brief that issue. It's called a mixed motive case and you can find persecution. But one of the problems here is sort of... I'll just address with that death threat issue. My only point was that it's hard to distinguish the animus towards Sarraxene's husband and any direct religious discrimination. And so it's hard for me to understand that argument when he says... When the testimony is, I have been warned several times that I should resign from this faith that I have embraced. And they have wanted me to go and take the path of my father as being a very patriotic man and not being, in other words, a traitor to the religion. And that was why they threatened to kill him. We have a... That's ER-122. That does appear to be in the record, Your Honor. ER-122. I'm looking at that. You want to look at my copy of ER-122? I stated that does appear to be in the record. Oh, I'm sorry. Okay. Yes, it's in the record. So what do we do with it? Haven't we held that death threats constitutes persecution? Death threats alone have not been found to be persecution. But we don't have death threats alone in this case, do we? Well, that's why I'd like to address some of the other issues. All right. With regard to the issue of economic persecution, another issue that was raised, Sargsyn testified that she was unable to obtain employment because of her religious faith. But the record shows that that's, in fact, not the case. She testified later that she was unable to obtain employment because she hadn't taken an exam and taken an internship. Then she says in 1999 she was, in fact, able to take that exam. And then she also testifies in 1999 she was, in fact, able to obtain that internship. So we certainly don't have the economic persecution that this Court has found to establish persecution and asylum claim. So looking at all the incidents here, the 1995 incident, 1997, now marriage certificate, 1999 attack at the literary event, we simply have one incident that has the continuous ability to practice a religion. Now, in 1999, that's when she got pulled back by the hare. I think she was trying to help her, as we say, husband. And they pulled her back by the hare and then pushed her face in the mud. Isn't that true? Correct, Your Honor. But are you arguing that was not persecution on account of a religious basis? Well, the problem with the 1999 incident is that, first, it's unclear who perpetrated this attack. Okay. Whether it was the government or a group the government was unable or unwilling to control. Let's get by that for now. Or whatnot. All right. The other problem is that it's unclear that it was based on religious motive. Sargsyan's husband spoke at the time, and he spoke about many things. He spoke about religion, but he also made clear he spoke about other things. He spoke about enemies in the government, and he spoke at a literary event celebrating his controversial father, who the record shows was disliked by certain individuals. He spoke on that, and then later he's beaten. So it's not clear and certainly not compelling from the record that he was attacked based on his religious beliefs. Well, what about her? When they pushed her face in the mud, didn't they say something to her about that religious or am I misremembering? I believe there is some reference about a baptism, something of that sort. Yeah. But they initially attack him. They assault her because she's trying to help him. And based on that, the evidence that we see here, there's just nothing that would compel any reasonable fact finder to find it was based on religion. I see. The other issue I'd like to address because I see my time is coming to a close is the credibility issue. I submitted a 28-J letter on Friday, and I apologize for not presenting this issue earlier. I came in case late. The issue of credibility under this Court's precedence is not properly before the Court. And that is because this Court has made it clear that when the BIA expressly reserves the issue of credibility and does so by assuming the petitioner to be credible and then makes its decision, that the proper course is to evaluate the evidence and, if believed, determine whether it establishes an asylum claim. If the Court believes that looking at the evidence and accepting it is true that we have an asylum claim, then the proper course is to remand to the BIA, determine in the first instance whether or not the credibility determination was correct. And when I look at the BIA decision, we have ---- Which case is that? You put these two cases? We have two cases. We have Briones' decision, en banc decision, by this Court. And Briones makes the point that where the BIA has expressly declined to rule on the issue of credibility, the proper issue is remand. The other case that I cite is Cardone-Martinez. And in that case, we have language very similar to what we have here. In Cardone-Martinez, the BIA states, even were we to assume that the respondent was a credible witness, we find that she has not adequately established an asylum claim. And looking at page 2 of the record, the BIA decision, we have a statement by the BIA saying, even if the lead respondent was found to be credible, nothing that happened to her in the past was of a level of harm amounting to prosecution. Therefore, I believe under these precedents, even if the Court were to find, which the government disagrees with, that the facts establish persecution, then the proper course would be to remand. If the Court would like to address the credibility issue, I can certainly address that issue now, but the government believes that the credibility issue is not properly before the Court. If the Court has no further questions, the government would ask that the petition be denied and submit the case. All right. Thank you. Thank you. So, counsel, have you had a chance to look at the submissions in the 28J letter? Yes, Your Honor. They're completely improper. The cases are clearly distinguishable, and the government cites to one sentence in the BIA's decision and ignores the most important sentence, the sentence where the BIA adopts the IJ's decision after its independent review, cites its own holding in Bourbono. And this Court has routinely held that where the BIA cites the Bourbono decision, that Bourbono affirmance signifies that the BIA has conducted an independent review of the record and has determined that its conclusions are the same as those articulated by the IJ. And that's the Abebe v. Gonzalez case, 432 F. 3rd, 1037. That's this Court in 2005. But doesn't Abebe say that if the BIA expressly exempts an issue, then that's not adopted? There's no express exemption in the BIA's decision. So you don't read the saying we'll assume her credible as accepting the credibility determination? Absolutely not, Your Honors. The Court adopted the decision, adopted the adverse credibility by the IJ, and then adopted the severity determination of the IJ. And then they say, and then they put in the end of their, in that five-sentence decision, that assuming that the credibility determination would be overturned, we still find that the severity of the prosecution is insufficient. That's just clearly contradicted by the substantial record in this case. The government's cases are distinguishable because the BIA in those cases did not make the independent review and they did not make a bravado affirmance. Here the BIA did. The BIA did do that. So remand is not proper in this case because the BIA already made that independent review. I would cite the Court to the record very quickly regarding the beating in 1999. Tadavos did testify on the administrative record on 122 to 123 that the government did beat him. And that also, we talked about the secrecy, and that came up in Anna's testimony on the administrative record on page 96. Your client is the wife, and the claim here is that she was not attacked because of her religious belief, but because she was trying to help her husband. She was pulled away and her face pushed in the mud, and it was because she was trying to help her husband, who was being beaten because of what he said. Because of what he said, because of his religious beliefs, they were clearly already identified as husband and wife, as together, as Pentecostals. The fact that Tadavos is the son of a famous poet only makes him a much clearer and obvious target. Well, the foundation of your argument seems to be that then the attack on him is imputed to her. Is that right? Well, I don't think so. I think the attack was on both of them, and the religious references were made to Anna specifically. Isn't that the key thing? I mean, in the body of case law that we have, we usually take as the most significant evidence of motive the statements that are made by the persecutors at the time of the attack. And here, when they were throwing her face in the muddy water, they were saying, well, this is your baptism. I mean, that would seem to be your strongest evidence. I think it's a clear reference to the religious animus towards Anna. Absolutely. All right. Well, thank you, counsel. Sargisian v. Mukasey will be submitted. And Hendon v. Four Seasons has been moved to Wednesday. And we will take up Delgadillo v. Woodford. Debra, can you get any water on here? I'm freezing.
judges: Thompson, Wardlaw, Ikuta